Pearson, J.
 

 It .is only necessary to consider one exception, as that is well founded, and gives the plaintiff's right to a
 
 venire de novo.
 

 A-grant issued to one Harrison in 1760; in L793, Robert McRee took possession under
 
 color of title,
 
 and died in 1794, leaving a will. His son, William McRee, took possession in 1795, and continued in uninterrupted possession,
 
 *12
 
 “exercising acts of ownership over the land,” until his death in 1818. Alter his death, proceedings, (whicli will be noticed hereafter,) were taken against his heirs by a creditor, and in 1825 the lessor of the plaintiff became the purchaser at sheriff’s sale, and took a deed in 1828. The will of Robert McRee directs, that, after the death of his wife, who is long since dead,
 
 “all
 
 of his land, &c., be valued, and whatever it is valued at, to be divided into six parts, and each of my children to have their equal part. I desire my guardian, Robert McRee, do draw my son William’s part; and I desire that
 
 my son
 
 William see this, my last will and desire perfected.”
 

 In 1839, one James Bryan, the
 
 father of
 
 the defendant, took possession without color of title, and remained in possession until 1843, when the defendant took possession without color of title, and still remains in possession.
 

 The action was commenced in 1847.
 

 His Honor charged, “ that, if Robert McRee had taken possession before 1795, under color of title, and died in possession, and his son William had succeeded him in that possession, his entry was not to be considered adverse to that oí his father, unless so shown to be, and his possession, thus continued until 1818, would ripen the title of his father’s heirs and devisees, under his color of title, and bar the right of Harrison. But the plaintiff could not make title under William McRee, because the will of Robert McRee deprived William of any right to the land as the heir or devisee of his father, and, having no title himself, he could transmit none to his heirs.’’
 

 .When title is out of the State by grant, a
 
 continued and uninterrupted
 
 adverse possession lor twenty years, without color of title, or such possession for seven years with color of title, gives a title to the person, so holding possession. We therefore concur with his Honor in-the opinion, that, as William McRee held such possession for more than twenty years, and exposed himself to the action of Harrison
 
 *13
 
 or his heirs, it barred the right, which they neglected to assert. But we think it gave
 
 the title to William, Mc-
 
 Ree!, and we are at a loss to conceive how, instead of having that ellect, it can be made to have the effect of ripening the title of the -devisees of Robert McRee. He was a wrong-doer, and had a mere color of title; of course, his will could not pass the estate to his devisees. After Iris death, William McRee, by taking possession, made himself a wrong-doer, and was exposed to the action of Harrison or his heirs, and when Tie acquires the title by their negligence, then the devisees of Robert McRee, who had kept out of the way during the time of danger, are made to step forward and assert, that in some way or other, this acquisition of title “enures to their benefit.” William McRee was not their tenant, nor was he their agent. They had no title, and could neither gain nor lose by his acts.
 

 It was urged in the argument, that the will of Robert McRee constituted William a trustee and vested the legal estate in him, in trust for the persons, among whom it. was to be divided. This, as it seems to us, would be a strained construction ; but, not to raise a question of construction, admit that he took the legal estate as trustee, at his death it descended to his heirs, and could be sold under execution ; and admit further, that after the lapse of so many years, the supposed
 
 cestui que trust
 
 would be at liberty to set it up in a Court of Equity ; how is it possible that the defendant, who is a stranger and a wrong-doer, can take any benefit from it in a
 
 Court of law 7
 

 Again, it was urged, that although there was not a perfect trust under the will, because it did not vest the legal estate in William, yet there was an imperfect trust or moral obligation imposed on him, growing out of the fact that one of the devisees was his
 
 “
 
 own sou,” and the others his near kinsmen, and his father had by his will desired him to see “ this my will and desire perfected,” and it was therefore
 
 *14
 
 wrong in William to attempt to acquire the title for himself, and he will be presumed to have acqqired it for the devisees of the father. In other words, he will be presumed to have become a wrong-doer for their benefit.
 

 This idea of an imperfect trust or moral obligation is too attenuated to be handled, even in a Court of Equit}?-. All the objections to the defendant’s taking any benefit from it in a Court of law, which have been pointed out in reference to a perfect trust, appty to it with increased force; for, if a Court of law will not notice an express perfect trust, how can it notice one of the kind supposed ? We think there is error. His Honor ought to have told the jury that the title was in the heirs of William McRee.
 

 The remaining question is, did the lessor of the plaintiff acquire title by his purchase at the sheriffs sale? His Honor was of opinion that he did not. In this, we think there is error. The defendant is a wrong-doer, and as against him it is sufficient to show a sale, a sheriffs deed to the lessor, and an execution which authorised the sale—
 
 Rutherford v Rayburn,
 
 10 Ire. 144; for, if it be not necessary under the act ofl84S, to show a judgment in an action against the debtor in the execution, or one claiming under him by a transfer after the lien oi the execution attached, of course it is notin an action against a mere wrong-doer.
 

 To the sale and sheriff’s deed, there is no objection, but it is said the paper, alleged to be an execution, is
 
 fatally
 
 defective, and that is the point on which the case turns. The paper is in these woids :
 

 “
 
 To the Sheriff of Bladen County, greeting :
 

 Jonathan Evans & Co., )
 
 vs.
 
 V Order of sale. Heirs at law of Wrn. McRee, dec’d. )
 

 It appearing to the satisfaction of the Court, that a judgment tvas granted against James P. McRee, the administrator of William McRee,- dec’d. by J. E-vaus & Co., for the
 
 *15
 
 sum of 12£ Is. 6d., with interest from the 1st of July, 1851. Administrator plead no assets.
 

 Oct. 14th, 1818. J. SEAWELL, J. P.
 

 Said judgment revived for the above sum and interest against the said Administrator, who plead no assets, by Robert Melvin, J. P., 20lh January, 1823;
 

 STATE OF NORTH CAROLINA,
 
 ?
 

 Bladen County. t
 

 To any lawful officer to execute and return agreeable to law: you are hereby commanded that of the lands and tenements of William McRee, dec’d., you levy on so much thereof as will satisfy the above judgment with interest and costs, and make return to next Court and have the same agreeable to law.
 

 Given under my hand and seal, this 27th May 1823.
 

 ROBERT MELY1N, J. P.
 

 Levied on one hundred and nine acres of land, the property of William McRee, dec’d., joining James B. Purdis’ lines and James Bryan’s lines on the north-east side of the North West River, this 4th July, 1823.
 

 D. MELVIN. D. S.
 

 Whereas, writs of
 
 scire facias
 
 issued legally against the heirs at law, and the sheriff made due return thereon, that the defendants reside out of the State, and are not to be found, those who are minors, have no guardians, on whom a process can be served, May Term, 1825. Court ordered judgment to be entered up according to
 
 sci.fa.
 

 Court of Pleas and Quarter Sessions, May Term, 1825, Court ordered the sheriff to advertise, and sell agreeable to law, as much of the above described laud as will satisfy the above mentioned judgment, interest and costs of this
 
 sci.fa.
 

 Attest. ALEX’R. McDOWELL,
 
 Clk.
 

 Issued 7th June, 1825.
 

 Upon this the sheriff returns, that he sold the land levied on to the lessor for $100. It is said this is no
 
 venditioni exponas,
 
 but professes to be a mere copy of the order of sale, and is not returnable to any given time and place.
 
 *16
 
 All of these objections are fully met by
 
 Lanier
 
 v
 
 Stone,
 
 1 Hawks 329. There the paper was not even directed; here it is directed to the sheriff, and in thelanguage of the Court, “ the proceedings might have been more formal, but it is right in substance.”
 

 It is next objected that the cáse comes within the decision in
 
 Roberson
 
 v
 
 Woollard,
 
 6 Ire. 90, where it is held that a
 
 fieri facias
 
 commanding the sheriff “of the lands descended to tire heirs 6f Joseph Roberson to cause to be made, &c.,” was void, because the heirs were not named. That decision was made in 1845; and the reasons on which it is put are, first, “ because it is necessary that the execution should conform to the judgment in all respects,” and much stress is laid upon the fact that there
 
 were Jive
 
 heirs, and the judgment had been taken against
 
 only four of them;
 
 so the execution in its general terms extended to one against whom there was no judgment. This difficulty is obviated by the act of 1848. Second, “ that the sheriff may know certainly whose property he is to sell.” This difficulty is obviated ; for, in that case, the sheriff was to act under a
 
 Jierii
 
 facias, and to ascertain the land himself; here the writ is a
 
 venditioni exponas,
 
 the land had been ascertained by the levy and return of a constable — it was in
 
 custodia legis,
 
 and the sheriff was simply ordered to sell “ as much of the above described land as will satisfy the judgment.” The names of th^ heirs of William McRee was information, of which the sheriff stood in no need.
 

 Per Cueiam. There must be a
 
 venire de
 
 novo.